The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Please be seated. Your panel today, Judge Harris, Judge Keenan, myself, we are prepared to hear three arguments today. Looking forward to them and we will begin our day with the case of Zeigler v. Eastman Chemical Company. We will hear from the appellant's attorney, Mr. Bogard, I believe? Bograd, Your Honor. Bograd. Thank you for the correction. You were not the first to mispronounce it over the years. It must be I have a name too that you wouldn't be the first to mispronounce. Is the mic in a good position for you here? Yes. May it please the Court. Louis Bograd for plaintiff's appellants Jackson, Vann, and Zeigler. This appeal arises from a tragic industrial accident at a plant in Calhoun County, South Carolina, in which the plaintiff's employees of DAC were severely injured. The only issue on appeal is whether the District Court erred in holding that it lacked jurisdiction to hear the plaintiff's personal injury claims against defendants Eastman Chemical Company and Mundy Maintenance Services. Let's go right to it. Sure. Judge Charles felt that went one way on it and now we have this case from South Carolina, the Supreme Court, the King case. It looks to me to be key. Is it the key case here in terms of determination of the issue in this case? Your Honor, I think the King case is virtually dispositive. The cases are not identical and we can talk about the distinctions, but they are virtually on all fours. So I'm trying to, Kevin, at least in terms of where we are today, normally we could go and we could spend a little time talking about facts, going all through it. We've done all that. It looks to me we've got, unless my colleagues feel differently, a very keen legal issue here that arises from it. A very keen legal issue. Does this case, in light of the facts before us, lead us in a different direction? So if that's the direction you think is appropriate. I wholeheartedly agree, Your Honor. In our view, I was almost tempted to stand up this morning and say, in light of Keene, I'd like to let the other side go first, but that's not standard protocol in the Court of Appeals. Let me stand it if it works. Don't do it just for the sake of doing it. If you think that is something you can do, you can do it. Well, I think I'll spend a few minutes outlining both the similarities and the differences. Okay. And if I could follow in with just one question. What do you think that the South Carolina Supreme Court meant when it said what is or is not part of the owner's business is a question of business judgment, not law? I mean, that seems to be a very marked departure from all of its prior holdings in this area. What does that mean? Well, first off, Your Honor, I will answer that question directly, but I think it's not a marked departure. As the South Carolina Supreme Court itself said, starting with Bridges in 1963. Oh, yeah. I don't want to say they tried to argue that it wasn't a marked departure, but it seems to be a departure from the three-part test, does it not? Why isn't it a departure from the three-part test that they had articulated over the years? It's not a departure from the three-part test for a couple of reasons. First, this is a question of statutory interpretation. And what they were saying is that the three-part test was a judicial creation to interpret the meaning of the South Carolina Statute 421400, South Carolina Code 421400, and that in some ways the shorthand phrases of the test had taken the focus away from the statutory language and that they were recasting the tests in light of the language of the statute itself. It's the statute that talks about whether the owner undertakes to perform or execute work which is a part of his trade, business, or occupation. Right. And the court seems to be shifting its focus to the business owner's intent and whether the business owner is trying to avoid the cost of insuring workers, isn't it? And these aren't hostile questions. No, no. I'm just interested in. I'm not perceiving them hostile, Your Honor. Okay. The fact is this has always been a very fact-intensive inquiry because as a number of the opinions say, and I'm not going to remember which ones, what is a part of a multinational corporation with thousands of employees might be a very different question from what is a part of the business of a small firm that only employs a dozen people and needs to bring in outside contractors to do a lot of its side businesses. So it's always been a question of what are the particular facts and circumstances of this business and the relationships between this business and its contractors. And what the court said is fundamentally we are going to look at this question of what decision did the company itself made about what is its business. And we have been arguing in this case from the beginning, and unfortunately we didn't have the benefit of the keen decision to present to Judge Childs, although we did have the Court of Appeals decision on reconsideration. We've been arguing from the beginning that since 2011 when Eastman sold its plant to DEC and essentially eliminated its entire workforce, transferred its workforce over to DEC, that it has not been in the business of producing specialty chemicals. It has not been in the business of maintaining production lines. None of those things have been a part of its business because it only had three or four employees at the plant who were all managers to liaison between DEC and Eastman. They had no production staff. They had no maintenance staff. They had made a business decision to exclude all of that from their work. And I think if you go to the key quote from Keen, which talks about, which asks three questions, right? Does the company believe its workforce is not equipped to handle a certain job? Well, clearly here, they had no workforce that can handle this job. They only had three employees. None of them were engineers. None of them were maintenance workers. None of them were production workers. So the company clearly believed it did not have a workforce that could do this work itself. That's why it signed it. I understand Judge Keenan's question to an issue that may arise. If we, and we are, the Keen case is the law of South Carolina. So the interpretation is how it is applied in this case. But should it be retroactive if we decide to take it? Or would this approach impose a liability on Easton and money where none had existed before? Your Honor, there's no question this case should apply retrospectively. And I'll give you, I think, four reasons for that. First, the precedent on this issue is very clear. Judicial decisions are presumptively retrospective and apply to pending cases. The only exceptions are when the court creates a new cause of action or abrogates an immunity. Neither of those things happened here. They did not abrogate an immunity. They clarified a test. And we didn't brief the retroactivity issue because we filed simultaneous supplemental briefs. But if you look at Lord versus DNJ Enterprises, 757 Southeast 2nd 695, Carolina Chloride versus South Carolina Department of Transportation, 391 South Carolina 429, or Miranda C versus Nissan Motor Company, 741 Southeast 2nd 34, each of those cases talk about this basic body of law. And that when all the court has done is clarify, refine, refocus, evolve a test, it applies retroactively. It's only when cases or immunity doctrines have been abrogated that they have been applied prospectively only. And the cases cited by the other side in its supplemental brief are not to the contrary. They cite two cases, Huffman and Brown, both of which involve the abrogation of charitable immunity. So, yes, indeed, the courts recognized that companies, that charitable entities that did not maintain liability insurance needed time to adjust to this new doctrine. So those should be applied prospectively. And they cited the Toth case, which is a case that was applied retrospectively. It's interesting in this regard, Your Honor. Well, one last point to go back to what I was saying to Judge Keenan a minute ago. This is not a new doctrine. Yes, we have not had as clear a statement from the South Carolina Supreme Court previously as we got in Keenan. But as the court said, you can look at most of the decisions since 1963 and find a consistent pattern of deferring to the business judgment of corporations, of the corporations involved and whether they thought something was part of their business or whether they outsourced it. So this is not a new rule. This is not something that should have come as a huge shock or surprise to Eastman or to Money. Well, it may not be a new rule, but it certainly appears to be a departure of some nature. At least the King case did make out that the three older tests remained valid considerations. What do you make of that? Are we supposed to then go through each one of them? Or did Keenan basically supplant those tests? I don't think so, Your Honor. Your Honor, may I make one more point of retroactivity before I answer that question? Please, go on. I just wanted to make one last point speaking of retroactivity. Mr. Bogan, my opposing counsel today, represented Selanese Hoekst in the Keenan case. And when they moved for reconsideration in Keenan, they specifically asked the court, even if you're not going to change this decision, at least make it prospective only because this will upset all of our settled business expectations and the like. And the court denied reconsideration. Exactly the same thing happened in the Miranda case I just cited. Not in Miranda. The predecessor case to Miranda was a case called Branham that had changed the rules regarding design defect cases in South Carolina. And plaintiff's counsel in that case didn't like the new rule and asked for reconsideration to make the case prospective only. And reconsideration was denied when he then, the same counsel then brought the Miranda case against Nissan and tried to argue for retrospective, for prospective only application. To make a decision from here of what counsel argued one way or the other. What I'm saying is the court deemed it significant that the Supreme Court denied reconsideration despite being asked explicitly to change the rule to make it prospective only. I'm not sure that carries much. The fact that you deny something and don't affirmatively state it. But let's move on. Let me go to your question. Yes, so the three tests. I don't know entirely what the court meant by saying that the three tests remain valid considerations. I don't think you need to go through them. I think the key test is the test articulated in Keene. Did the company make a business judgment? This wasn't part of the case. But I think what they were really doing was looking at those three prior tests and saying you can consider all of these factors. The first one was, is it an important part of the business? That was test one. Well, and Keene is saying the key word is, is it part, whether important or otherwise. The second test was, is it an essential and integral part of the business? Again, part was part of the test. And the one that I think is most confusing is the third test, which is the one about whether the work has been done previously by the company's employees. And it had, had it not? And it had. Well, yes and no, Your Honor. That test derives from the Bridges case. And I think that the defendants have been trying to read a lot more into that test than it can bear. The third test is, is this work usually or customarily performed by the defendant's own employees? In Bridges. I thought the quote from the Pope case, POCH was it, had it previously been performed? That is, I understand that that is the language in which the test is usually described. But if you go back and read Bridges, which is the case from which that test derives, Bridges was a case where the company had its own electricians on staff who could do all this work, but they had been overtaxed. And because they were, and because the work needed to be done on a holiday weekend, they decided to bring in contractors because they didn't think their own staff could do more overtime. So it was sort of a temporary replacement workforce. And the court said in that case, clearly the company had made the judgment that normally electrical work was part of their business. Not, that's not this case. Here, the company in 2011 made an explicit decision, we are never again going to be doing production. We are never again going to be doing maintenance. We are putting all of this way behind us. We are selling this business and transferring all of our employees at lower salaries and the like to this other company. We're getting out. And once they made that decision, I don't, you know, it can't be the case that the fact that at some point 10 years earlier, 15 years earlier, 100 years earlier, a company did something that it no longer does, that they are forever barred from changing the nature of their business and therefore changing the nature of the test. So I think, I'm sorry. In terms of what we do with the three-prong test, which the court does not overrule, I mean, is the right way to think about it? Is this what you're saying that we might look at those three factors sort of in applying the standard that comes out of Keene? They might, as in the Bridges case, they may shed some light on whether this is being done for a legitimate business reason or whether something else is going on here. But we would have to sort of run them through the Keene standard. I see my, I'm about, I just ran out of time. May I answer the, respond to that question? You may. I think that's exactly right, Judge Harris, that they are, the court didn't want to say, because the court was saying this is not a new doctrine. This is an evolution of our existing doctrine. The court said, you can look at these questions. How essential to the business is it? How important to the business is it? Is this work normally performed by the company's own employees? And those may factor into your application of the Keene test and into the question of whether these workers are doing something that is, that the business itself thinks is part of its business. But they are not, they aren't independent grounds for finding statutory employment if the Keene test is not met. And I'll reserve the rest of my time for rebuttal. Thank you. We will hear from the appellee in this case. Mr. Bogan. Thank you, Judge Wynn, Judge Harris, Judge Keenan. My name is Matt Bogan. I'm here today on behalf of Eastman Chemical. And I want to address each of the questions you asked my brother at bar. But first, I would like to start at Joint Appendix page 269 and 270, which is Judge Child's order on rehearing. And timing here is important. If you'll bear with me for just a second, it's like a train passing down tracks as these cases are going along. Judge Child's ruled in our favor, dismissing the case, saying we had statutory immunity. Keene came down from the Court of Appeals. Rehearing was sought there. They sought rehearing based on Keene. So May 13, 2019, the South Carolina Court of Appeals denies rehearing in Keene and says Keene is not covered. I mean, Keene, no immunity for host celenies, CNA holdings under the tort claims, under the workers' comp statute. Seven days later, May 20, with sober eyes, four eyes on Keene, Judge Child's recognizes and says this is distinguishable. I'm finding that Eastman previously did this work, and I'm finding that this case should be dismissed, and Eastman and Mundy are entitled to immunity. So 269 and 270, that's the starting point. And I start there because it's an anchor point, because the Supreme Court in South Carolina affirmed in toto the Court of Appeals. Now, they have some different interesting language, Judge Keenan, that I'm not sure exactly what it means. I'm going to do my best to try to give my thoughts on it if the Court asks about it. But here's the thing. The outcome didn't change, and Judge Child's, in a learned opinion, was aware of it and found this is distinguishable, and the facts do matter. Our Supreme Court has steadfastly said it's a case-by-case decision. In this case, it has to be decided on its facts. And I'll talk, Judge Wynn, as much about facts as you want. I'll talk as much about the Keene case as you want. But I think we win this case in two different ways. Number one, Judge Child's had it right. Keene didn't change it. You look at the test. Let me make sure I understand the pattern here. You cite the South Carolina Court of Appeals case. Yes, sir. That was the Keene case, and then the South Carolina Supreme Court heard it thereafter? Thereafter, yes, sir. And what do you make of the Court of Appeals case? The outcome was affirmed in toto. What does that matter if the Supreme Court of South Carolina subsequently rules on the case? Your Honor, I think in terms of – I'm trying to make a practical point that Judge Child's was not without the benefit of – We're not putting Judge Child's on trial here. We're simply trying to determine the law of South Carolina. I understand. And it is very clear. I sat on the Court of Appeals in North Carolina for a number of years. I wish I could elevate the opinions I wrote above those of the Supreme Court. But it's pretty clear. We're only going to look at that South Carolina Supreme Court opinion. Yes, sir. But I'm not trying to be argumentative. I'm trying to get the – because you could persuade us otherwise. I'm trying to understand what is the import of a Court of Appeals opinion, even on the district court there, if she's ruling consistent with it and the South Carolina Supreme Court issues a subsequent opinion, why in the world would we look to see that? Judge Child's, I would agree. She probably acted reasonably within what was going on with that opinion. She did not have the benefit of the Supreme Court South Carolina opinions, did she? So that's what we're really talking about, right? Fair enough, sir. But I don't want to just be fair enough. I don't want to brush it aside. I think it's a focal point. I want to move your argument. So you address this question. Does the Supreme Court of South Carolina's opinion in Keene change or impact this case? And how so? Irrespective of the Court of Appeals opinion, which, as I said, I have a lot of respect for that court because I was on it, but I know this is the final court. So give us the final opinion and how it impacts this case. It doesn't affect the outcome at all. The outcome is still the same. We're entitled to immunity under the statute. And my point practically with Judge Child's was she didn't see into the future, but her analysis is still the same, even under the Supreme Court's final decision in Keene, and here's why. If you look at record Joint Appendix page 756, that's the annual statement of Eastman Chemical, which shows it is in the business of making specialty chemicals, right? It's PET. It's plastics, hot plastics that come out that go make coverings on V8 bottles that you buy in the grocery store. And at 756, it shows that our AM segment, which is the advanced material segment, which ties in Doug Reister's deposition. We're in the business. Tell me this. How did Keene change, or did it change at all, this test for assessing the scope of the statutory employee doctrine? Do you think it changed it at all, or do you think it didn't do anything? Judge Wynn, it certainly was a long opinion that Judge Few authored, and it has to have some meaning. So I do think it had to in some way change it, but I don't think it changes the outcome of this case. It was a long opinion about nothing. It could have just affirmed the Court of Appeals opinion or whatever. Is that what you're saying? You're saying it didn't? I thought we were going to start at a point that at least it did something. I think it probably narrowed it, but it doesn't change the outcome in my case. Can I ask you a question, Counselor? So the standard, as I read Keene after Keene, is that if there's a reasonable business case for contracting out, if a company's own employees aren't equipped to do the job, there's some other good business reason why you would want to contract out, and it's not done for the purpose of avoiding the costs of insuring and liability, then it's not part of the business anymore. So which part of that standard do you think you win under? Because I don't see it. There seems to be a reasonable business case. They sold most of their holdings. That seems like a reasonable business case at that point. They've only retained a few managers. And I don't believe there's ever been an allegation that this was sort of a bad faith effort to kind of get out from under liability for insurance. So under which part of that standard do you think you prevail? Well, yes, ma'am. Here, that plant, the transaction that happened in February of 2011, Eastman retained four lines at that plant. That's 13, though. It sold nine. Yes, ma'am. So it had four there and chose to employ it through subcontractors with DAC. So you think there was either no legitimate business purpose for doing that or it was a subterfuge, the wholesale, the whole thing was just a way of getting around insurance liability? No, ma'am. I don't think it was either one of those. Well, if it wasn't either of those, how do you prevail under Keene? Well, we still were previously in the business because that still exists, as Judge Keene pointed out. But I want to answer your question, Judge Harris, on this point that here, different than Keene, we were coinsured on the insuring agreement. That was not true for Daniel Construction. I guess I may not be framing my question right, and I will just try one more time to clarify. So as I understand it, and maybe you disagree with my summary of the Keene standard, but you can prevail if one of two things is true. There's no reasonable business case for contracting out here and or it was done for the purpose of avoiding the cost of insurance. And I'm just asking you under which of those prongs are you arguing? Your Honor, I guess we do disagree in that I don't know that that's the outcome determinative factor test on that because you have to look at whether it's part of the trade. You're not arguing that either of those things is true here? No, ma'am. Okay. And so trade, occupation, and business is the question. That's what Justice Few, in his opinion, and Keene said. And he went back to the 1939 case of March Banks, which looked at trade, occupation, or business. And our trade, occupation, and business at Eastman is making specialty chemicals, and we're still in that business here. And all across America and different parts of the world, we're making these. Here, we do it with DAC employees who we cover under a workers' compensation regime. And we're co-insured on the policy. That's different than Daniel and CNA holdings. But I do think, Judge Keene, to your earlier question, it is important that we previously did this work prior to February 1, 2011. Well, I think that's kind of the heart of where it seems like your argument is. You seem to say, well, you say, that the Eastman employees previously performed this maintenance work before 2011 sale to DAC, that that is still part of the Eastman's business five years later. So I think that's kind of a conundrum for us right there. Straighten that out. Because it seems to me that there was an outsourcing of that part of the business when it sold a plant and hired DAC. And so the question is, is there any evidence in the record that suggests that outsourcing maintenance work to DAC was not a legitimate business decision? And that goes back to Judge Harris' question. But don't go back to her question. Go to that question. Is there any evidence in the record suggesting that the outsourcing maintenance work to DAC was not a legitimate business decision? And I hate to ask the court a question, but I guess I don't understand the question. Well, maybe you don't understand the question, but the answer is what we want to hear. And then you can work from the answer. Either you say, yes, there's a legitimate business reason, or there's not a legitimate reason. So that's a simple question. I think the parties contracted, and it was a valid, lawful contract. So it has to be for, I mean, I don't know. It couldn't be illegitimate. That's why I struggle with the question, and, Your Honor, I know that may not benefit me answering it that way. But, one, it's truthful, but I don't think it's dispositive of the issue because that operating and servicing agreements, which they contracted, to have DAC employees do this work on lines owned by Eastman, it's still in the trade, occupation, and business of making specialty chemicals. And it's not trying to avoid or do anything harmful. Instead, unlike Daniel and Host-Celenese in the Keene case, we were co-insured on the policy to provide workers' compensation benefits, taking refuge under 421400 of the code. And I think we still passed the test. And I think it's fact-dependent. I think those facts really matter. I know the Keene case came out, and it looked like it narrowed. I mean, it has meaning, narrowed, made it harder, but we still qualify. And I think that's why I started with Judge Child's point, whether by forecasting or accident, she still got it right because we're in this business. And the outcome is still the same, no matter Keene, at least in my estimation. And those lines are essential to making the products we sell to clients, to make the shrink wrap that covers the V8 bottles that are sold in grocery stores. And those DAC employees operating and maintaining that line have to keep it going so we can make those products and sell them to the client. And we own those four lines. And I think that is vastly different than the facts of the Keene case where you had host Celanese is in the fiber business and the textile business. Daniel Construction is in the construction business and is there maintaining lines and doing things at the Celanese plant. And it's two different things. Here, it's the same business. It's operating and maintaining the lines so they're running. So it's vastly distinguishable from Keene. Your points are well taken. But I think it's all a determination of how we interpret what Keene is. If Keene changed things differently, and it does say valid considerations for the three tests, but Keene itself didn't even go through the three tests itself. It seems they created something different. You are constantly pushing the third part of the three-part test, the activity that has been previously performed by the owner's employer, from the third test that was there. The question is, is that still part of the standard for this? And if you go in the direction you're going, you're right. You're going to go on and on and tell us how this previously was. But if the law is interpreted differently in terms of the case itself, that's really not going to matter. You argue the case had Keene not come down as it would have existed. So where we're really splitting on it, because I don't want you to miss the opportunity, if there is an opportunity here, because if there's an opportunity to undo some confusion here, and that is the impact of the Keene case and what did it do, because that's where we start is what the law is. We don't start with what it was, but if you only think Keene was just a minor tweaking and did nothing to the statute, then that's one thing. But if the other side thinks it creates a different type test and brings out a different kind of outcome, that's another thing. But my point is focus on the law and then we can get the facts. Do you see what I'm saying? Because I don't want you to spend time. I can let you just go on out of courtesy just talking about this previously employed, but it's not doing you a favor if you're not articulating why that law is what it is based upon Keene. Yes, sir, and I'm sorry I went to where I have a minute left to do that, but thank you, Judge Wynn, for the guidance to get there. It's my estimation that the Keene opinion did not change the outcome in this case. I am not sure, but I have to trust the words of our State Supreme Court that said it didn't overturn those decisions and the three-part test still exists. But it didn't use it itself. They didn't even use those three tests in deciding Keene. Because it didn't need to, based on those facts, because it's still case by case would be my estimation, Judge Wynn. But I know we don't want to talk about facts. Can I ask you a question? You know, what we make of the preexisting three-part test and the kind of prior activity prong after Keene, the one thing that I really have trouble reconciling, I guess, with Keene would be the idea that because before the sale Eastman's own employees did this, that that means sort of now, many years after the sale, Eastman can't make a business judgment that they would like to change whether they use their own employees or not. I'm not explaining this right. Your version of the prior activity prong seems to mean that once a business originally decides to use its own employees for some purpose, it can never outsource that again because it will always be the fact that it was previously done by their own employees, they fail under the third prong of the preexisting test, case over. And I have a lot of trouble reconciling that with Keene's, whatever we think Keene did or didn't do, the huge emphasis on business judgment and allowing businesses to make judgments about what they want to contract out and what they don't want to contract out. How do I reconcile that with a rule that would sort of freeze in place the original business decision? Thank you, Judge Harris. Judge, when I see I'm out of time, may I continue? Of course. Thank you, Your Honor. Judge Harris, I would point to the quote from the Keene case that says, we're trying to prevent owners and contractors from subcontracting out their work to avoid liability for injuries incurred. I already asked you whether you were even arguing that that's what happened here and you said no. That's why we had an insurance agreement to cover for workers' comp. We weren't trying to avoid that liability. We provided for it. That's my very point. Through the operating agreement, we were the insured on the workers' comp insurance agreement. Here's the question on that. Where do you draw the line on when the work is no longer considered previously performed? Where do you draw that line? The limiting principle there, Your Honor, that I would identify, it's going to be fact specific, and I don't know if it's time, but I think it has to go to what the trade occupation of business is. That's what Justice Few was focused on. So it's dependent upon that. In instances like the PowerPoll case, which I think was the Bridgers case, where they were paying the PowerPolls and they didn't have enough employees to do that at the time and they hired somebody to come help the team, that was work previously done. That fit the fact pattern. So I do think there are limiting principles. I don't think it goes out into infinity, Your Honor. How this Court draws those lines, I think it has to be case by case, and I think it has to be fact by fact. Your Honor, I don't want to go out of bounds. You've been generous with the time, but if I might wrap up, unless there's other questions. Go ahead. Well, you do have a few minutes in rebuttal. Do you want to cut into that? No, Your Honor, I don't have any rebuttal. Mr. Munson has five minutes for Mundy. You want to trust him to carry on that point for you? I trust him very much so. He can yield some time to you. I just wanted to wrap up and say this. We think this Court should affirm Judge Child's decision that even in light of Keene from the Supreme Court, it remains correct that Keene did not change the outcome in this case. It may have made it harder to qualify for statutory employment, but we still do. And secondary, I rely on my brief on retroactivity. We do not think that we think this is a change. It takes away our immunity. It would. If you all say Keene, you don't get protection of the worker's comp provision, which we contracted for and bought insurance for, to not to avoid that liability, then it can't be applied retroactively. That would be our position. So we ask you to affirm. I'd be happy to answer any more questions, and thank you for your time today. Thank you, Mr. Boggan. Mr. Munson. May it please the Court. I represent Defendant Appellee Monday Maintenance Service and Operations, who is a bystander in this case. Eastman Chemical had this project. They needed a blowtorch. They didn't have a blowtorch. What do you mean bystander? Does it mean you won't have any, it won't impact you, going the way the other bystander from the factual perspective? Factually. Factually, we're a bystander. You're a bystander who got touched by the water that was being splashed, right? Yes, Your Honor. Eastman needed to borrow a blowtorch. They didn't have one. They called Monday, do you have a blowtorch? They didn't have anybody to operate a blowtorch, so they borrowed a blowtorch. They borrowed Monday employees to come over, run a blowtorch on a drain line that happened to be adjacent to this pump that's the center of this litigation. Monday's statutory immunity doesn't arise from being a statutory employer. The statute provides immunity for statutory employers and also for those doing the work of the statutory employer. That is the basis of Monday's immunity in this case. It's employees who were borrowed, Judge Childs found to be the fellow co-statutory employees with the other workers involved in this project. Is the issue regarding your client simply whether it's shielded by the borrow-servant doctrine? And if we say, you know, that's something that's relevant here, shouldn't we just send this back for the trial judge to determine if there's enough evidence in the record to support that defense? That would be an appropriate response here, but to say no, you don't need to do that, here's my reasoning. Originally, Judge Childs did not dismiss Monday, so we had to move for reconsideration. For her to dismiss Monday, she applied the standard of clear legal error manifest injustice. In doing that, she agreed that it was clear legal error for her not to cloak Monday with the immunity under the statutory employer standard that was given to the employees. Basically, responding at superior, being cut off as an employee doesn't rise to Monday. That was her clear error that led to dismissal. On the borrowed-servant doctrine, she's still operating on a motion for reconsideration, a clear error of law standard, and she found that it did not, quote, require reconsideration. To put that in college football parlance, she didn't confirm the call, she just didn't overturn it. Now, when it comes here... But how did it come here? Did you take a cross-appeal on that? No, Your Honor. It is here because I'm arguing that in the record, which was fully developed and argued below, this is another sustaining ground. We can't affirm on a ground that the district court rejected unless there's a cross-appeal, right? I will leave that to you, Your Honor. I can't say either way. What I would say is that she applied a different standard. Don't go by that. That's a critical point right there. I don't know the answer to that. That's a killer, what you just heard right then. You need to address that. My response to that would be that the standard that she applied is different than the standard. She's talking about the effect of a cross-appeal. I understand, Your Honor. That works in here. If you didn't do it, and I understand you want to argue, but we don't need to hear an argument that's theoretical and interesting if the rules are going to point us totally different in terms of it. So I posed the question from the beginning that even at best, what we would do is send it back to the trial judge for them to see if there's evidence. You're trying to convince us we ought to do it because there's something here to do it. But the question is, how do you bring that now without having brought a cross-appeal? If a cross-appeal is a prerequisite to that, I agree and would say it should be returned to the judge on the issue of the borrower-to-recovery. Well, we'd hope you would have known that before. We don't want to get up and say things like that, that it is a prerequisite or whatever, even though we may know the answer to it. But I wanted to point you in that direction because, as I said, it's nice to hear things said. But sometimes when you're talking to an appellate court, they'll let you just run on and just talk. But it's not really hitting anything. I know you want to hit something. I want you to make a difference with your argument. And, Mr. Munson, I am concerned about the fact that Judge Childs did say the record lacks sufficient evidence for the court to consider the second, third, and fourth prongs of the borrowed-servant doctrine, referring to page 282 of the appendix. Yes, Your Honor. So it seems to me that if we do disagree with regard to the impact on Keene, that is, disagree with Mr. Bogan, then don't we have to remand the Monday for the development of the record on the borrowed-servant doctrine? Your Honor, it should not. And if not, why not? Yes. The only reason would be that she used a higher standard in this court on sustaining on another ground, does a de novo review, based on what appears in the record. Well, no, I'm saying the district court herself said there isn't evidence in the record as to the second, third, and fourth prongs of the IDI test. And so how do, if we disagree with your fellow counsel, how do we do anything other than send it back? Her statement was that it didn't require reconsideration, which is a different standard than could be applied. That's the only basis I have. Right. It seems that the child didn't have to develop the record because Monday went out under the fellow-servant doctrine. Isn't that correct? That is correct, Your Honor. Okay. So she didn't have to get to borrowed-servant. But now, if we disagree, and that's a big if, but if we disagree that Cain didn't change the landscape, then we have the borrowed-servant doctrine bubbling up to the top that needs to be addressed. And the district judge herself said the evidence is insufficient on this record. I'm not getting to it. So how do we decide that borrowed-servant issue in the first instance when the record lacks details of furnishing of method of payment of the employee, the right to exercise control, the furnishing of equipment, the things that the judge said just weren't in the record sufficiently to make that determination? It would only be because in finding another sustaining ground, it's a de novo review. That is all, Your Honor. All right. Thank you. Any other questions? Thank you very much for your argument. Mr. Bograd, did I get that right this time? I'm sorry, Your Honor, that Mr. Bograd and I have such similar names. I'm sure it's complicating. I don't think either one of you had anything to do with that, so we're good. Thank our mothers and fathers. Could we start with the question I just posed to co-counsel regarding the borrowed-servant doctrine and Judge Child's observation that the record was incomplete? Your Honor, I think you're absolutely correct on that. So if we agree with you, you further agree that it does have to go back on the borrowed-servant doctrine? The grounds on which Mundy was dismissed was under the fellow-servant test. If you rule in our favor on the statutory employee issue as to Eastman, then the plaintiffs and Mundy's employees are not fellow-servants and the decision as to them needs to be reversed. I believe the borrowed-servant doctrine is actually not a doctrine of jurisdiction but a doctrine of liability, and therefore they would presumably be able to litigate it when we go back on the substance of the case. But clearly the decision as to them needs to be reversed as well because we can't be fellow-servants if our employees are not statutory employees. But I'd like to respond to some of the arguments made by Mr. Bogan. First, he made a big point of saying that Eastman Chemical Company is in the business of making specialty chemicals. I think that's disputable, at least at the Calhoun County plant, where they didn't have any employees to make specialty chemicals. But this is not a case about production. This is a case about maintenance. These were maintenance employees. And certainly Eastman is not touting itself as in the business of maintaining chemical plants. And that's where I think Mr. Bogan made an important error of fact that the court needs to focus on. The agreement with DAC had two sub-parts, the operating agreement and the services agreement. You can find them both in the joint appendix, the services agreements at JA 400, the operating agreements at JA 453, and they both go on from there. It's the operating agreement which covered production that specifically talks about this leased workforce to produce specialty chemicals at the plant. And it's the operating agreement that says DAC has to maintain workers' compensation insurance, needs to name Eastman as a co-insured, and that Eastman will be considered a statutory employee for purposes of workers' compensation law. The services agreement, which is the agreement under which all of the plaintiffs were employed because they were not part of the leased workforce, they were not production workers, says absolutely nothing about workers' compensation insurance. There are just no provisions about it whatsoever. Now, I'm not trying to suggest that Eastman was trying to avoid workers' compensation. I'm saying that all of his discussion about the contractual terms under which they sought to be specifically identified as statutory employer of workers at the plant refers to the production workers, not to the plaintiffs here. I've already spoken about Mundy. I also think in this regard it's important to note something that the Keene Court says about public policy and the public policy behind the statutory employer doctrine. The court is very clear that the applicable public policy, however, is to ensure that workers are covered under the workers' compensation law. It does not matter to the fulfillment of this policy who provides the coverage. And there's no dispute here that DAC did maintain workers' compensation insurance. Indeed, each of the plaintiffs has recovered workers' compensation from DAC. The independent question of whether they may sue in tort against Eastman and Mundy is an independent question. And as to that question, Keene said as a matter of public policy, the public policy at issue here is not to provide civil immunity to companies like Herx or their corporate successors like CNA Holdings. But I'd like to close with this point, Your Honor, Your Honors. This court clearly recognized two years ago the significance of the South Carolina Supreme Court taking the Keene appeal when it placed this appeal in abeyance. And it placed this appeal in abeyance until the South Carolina Supreme Court rendered its judgment in Keene. It took a lot longer than we wanted. There was the reconsideration petition and all. But this court sat on this appeal for two years waiting for the South Carolina Supreme Court to decide Keene. The South Carolina Supreme Court has now spoken. And its decision makes absolutely clear the plaintiffs were not Eastman statutory employees under the test announced by the South Carolina Supreme Court. For that reason, the district court's decision to the contrary must be reversed. Thank you. Thank you, counsel, on both sides. Appreciate your argument. You know our usual tradition here. You've seen it many times. We typically come down and shake your hands. But these are difficult times. And we think the risk exceeds the benefit of doing so here continually. But we wish you all good health. And thank you for having me with us today.
judges: James Andrew Wynn, Pamela A. Harris, Barbara Milano Keenan